UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
KEVIN P. CLUNE, as Executor of the Estate of
Barbara B. Clune, and JAMES E. FISHER,

                            Plaintiffs,

       -against-

DESMOND T. BARRY, JR., GEORGE J.
GILLESPIE, III, WINGED FOOT GOLF
CLUB, INC., and JOHN DOE NOS. 1-10,

                           Defendants.
-------------------------------------------------------x

**OPINION AND ORDER**

16 Civ. 4441 (NSR) (JCM)

     Plaintiffs Kevin P. Clune, as Executor of the Estate of Barbara B. Clune, and James E.

Fisher ("Plaintiffs") commenced this action on June 13, 2016 against Defendants Desmond T.

Barry, Jr., George J. Gillespie, III, Winged Foot Golf Club, Inc. ("WFGC")  and John Doe Nos.

1-10 (collectively, "Defendants"), alleging that Defendants committed violations of federal

securities law, common law fraud and breach of fiduciary duties in negotiating lease renewals

that destroyed the market value of Plaintiffs' shares in the Winged Foot Holding Corporation

("WFHC").  Presently before the Court is Plaintiffs' motion for leave to amend the complaint

pursuant to Rule 15 of the Federal Rules of Civil Procedure. (Docket Nos. 127-28) ("Pl. Mtn.").

Defendants filed an opposition, (Docket No. 135) ("Def. Opp'n"), and Plaintiffs replied, (Docket

No. 140) ("Pl. Reply").  For the reasons set forth below, Plaintiffs' motion is denied.

## I.  BACKGROUND

### A.  Relevant Facts

     Defendant WFGC maintains and operates a 280-acre property in Westchester County,

New York, which includes two golf courses, a clubhouse, and other amenities. (Docket No. 62

("Am. Compl.") ¶ 1).  The WFHC is the owner of the property. (*Id.*).  The WFHC was

incorporated in 1921 pursuant to the New York State Business Corporations law, and issued 600 shares. (*Id.* ¶ 22).[1]  The WFHC used the money raised from the sale of the 600 shares to buy 280 acres of land in Mamaroneck, New York, where it constructed two golf courses and associated buildings. (*Id.*).  Defendant WFGC was organized as a membership corporation and was formed for the purpose of maintaining and operating the property. (*Id.*).  To fulfill that purpose, the WFHC leased the land to the WFGC beginning in 1924 for a 21-year term, with provision for two 21-year term renewals. (*Id.*).  In 1947, the lease was amended to require the WFGC to pay a $30,000 annual rent payment to the WFHC. (*Id.* ¶ 108).

As alleged by Plaintiffs, originally, ownership of a share of the WFHC was a prerequisite to use the WFGC's facilities, and membership was limited to 600 individuals. (*Id.* ¶ 23). However, during the 1930s, when faced with financial strain caused by the Great Depression, the WFGC began admitting temporary members, who paid yearly dues, that were not required to hold shares in the WFHC to use the facilities. (*Id.* ¶ 32).  Ultimately, the WFGC permanently removed its policy requiring that full-time members own at least one share in WFHC in 1949. (*Id.*).  This change created a division of interests between the shareholders and non-shareholders; continuous renewal of the lease to the WFGC at a below-market rate benefits the non-shareholders, while harming the WFHC shareholders, who are deprived of the opportunity to receive market rate or sell the land, which would maximize the value of their shares. (*Id.* ¶ 33).

Around 1950, the WFGC amended its bylaws to allow the WFGC to acquire shares of the WFHC owned by deceased or resigned members "at the prevailing price then fixed by the [WFGC] Board." (*Id.* ¶ 121).  In 1961, in anticipation of another lease renewal, WFGC obtained

---

[1] Both the WFHC and the WFGC were organized by members of the New York Athletic Club.  (*Id.* ¶ 25).

a legal memorandum from a law firm rendering advice about WFHC and its lease. (*Id.* ¶¶ 129-44). Thereafter, Plaintiffs allege that the WFGC continued to buy shares of WFHC, (*Id.* ¶ 145), and provided false and misleading information about the value of WFHC shares to WFHC shareholders, (*Id.* ¶ 277). The WFGC attained majority ownership of WFHC in 1983, and has continued to increase its majority share since. (*Id.* ¶ 165). Moreover, the WFGC's lease has been renewed multiple times, each maintaining the $30,000 annual rent payment. (*Id.* ¶¶ 147-48, 185). The most recent renewal was executed in 2013 and extends the lease through 2071. (*Id.* ¶ 233).

## B. Procedural History

Plaintiff Clune originally commenced this action in 2016, asserting individual federal securities fraud claims, and individual and putative class New York common law fraud and breach of fiduciary duty claims. (*See* Docket No. 1). In 2017, Plaintiff Clune amended his complaint to add Plaintiff Fisher and additional factual allegations. (Docket No. 62). Plaintiffs subsequently moved for class certification. (Docket No. 99). Judge Román denied that motion, finding that: (i) "a panoply of practical concerns renders a class action an inappropriate means of adjudication" in this case, *i.e.*, the case would be unmanageable as contemplated by Rule 23(b)(3)(D) of the Federal Rules of Civil Procedure; and (ii) Plaintiffs failed to meet Rule 23(a)'s numerosity requirement. *Clune v. Barry*, No. 16-CV-4441 (NSR), 2019 WL 3369455, at *2-*4 (S.D.N.Y. July 26, 2019). The Second Circuit denied Plaintiffs' request for leave to appeal the denial of class certification pursuant to Rule 23(f) on November 7, 2019. (Docket No. 114).

## C.  The Proposed Second Amended Complaint

On September 20, 2022, Plaintiffs moved to file a second amended complaint. (Docket

No. 127).  Plaintiffs' proposed second amended complaint ("PSAC") adds alternative claims,

should the shares at issue not be found to constitute securities under federal law, under the

Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962, *et seq.*

(Docket No. 129-1 (PSAC) ¶¶ 308-16 (RICO allegations), 345-73 (claims under RICO §§

1962(a)-(d)). Plaintiffs allege that Defendants violated RICO by: (i) "perpetually extend[ing]"

WFGC's "sweetheart lease;" (ii) rendering WFHC shares unmarketable and depressing share

prices by restricting transfers; and (iii) fraudulently obtaining WFHC shares at prices which had

been artificially depressed by WFGC's unlawful activities. (PSAC ¶¶ 308-16).  The predicate

facts that form the basis of the alternative RICO claims are the same as those supporting

Plaintiffs' previous allegations; however, Plaintiffs add specific allegations concerning the use of

mail and wire communications to support the RICO claims. (*Id.*).  Moreover, Plaintiffs add four

"Director Defendants," formerly John Does 1-4 in the amended complaint, who comprise

WFHC's board of directors or were officers of WFHC. (*Id.* ¶¶ 17-22).[2]  Plaintiffs allege that the

Director Defendants and Defendant Gillespie formed the "RICO enterprise" that "engaged in a

long-standing pattern of racketeering activity." (*Id.* ¶¶ 309-10).

Under Plaintiffs' securities fraud claim, Plaintiffs' PSAC now specifies that: "Shares of

the Holding Corp. are securities within the meaning of the federal securities laws." (*Id.* ¶ 318).

Plaintiffs acknowledge that "[a]llegations of securities fraud cannot normally serve as predicate

---

[2] The Director Defendants are: (1) Thomas T. Egan (former John Doe 1), a director and Vice President of WFHC; (2) John P. Heanue (former John Doe 2), a director and Co-Treasurer of WFHC; (3) William M. Kelly (former John Doe 3), a former director and Co-Treasurer of WFHC; and (4) Francis P. Barron (former John Doe 4), a director and Secretary of WFHC. (PSAC ¶¶ 19-22).  The Director Defendants are not shareholders of WFHC. (*Id.*).

acts supporting RICO claims," (*Id.* ¶ 315), but state that Defendants have denied that the shares constitute securities in the related *Busher* case, (*Id.*); (*see also* Pl. Mtn.).   Plaintiffs allege that, "[e]ven if the [WFHC] shares were not securities, the shares conveyed ownership interests in the [WFHC] that included liquidation rights and other rights with economic value," and Plaintiffs were, therefore, injured by Defendants' alleged racketeering activities. (*Id.* ¶ 316).

**D.  The Related *Busher* Action**

Plaintiffs' counsel represented another WFHC shareholder in a shareholder derivative lawsuit filed on behalf of WFHC against Defendant WFGC, the Director Defendants and nominal defendant WFHC— asserting claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, violation of New York Business Corporation Law and seeking corporate dissolution. *See Busher v. Barry*, 14-cv-4322 (NSR) (JCM) (S.D.N.Y.). Judge Román accepted the instant action as a related case to *Busher* because it arose "from closely similar factual allegations concerning Defendant [WFGC]." (*See* Docket No. 3 (Statement of Related Case), June 16, 2016 Docket Entry (accepting case as related)); *see also Busher v. Barry*, 14-cv-4322 (NSR), 2019 WL 13217248, at *1-*2 (S.D.N.Y. Mar. 12, 2019) (describing underlying factual allegations).   Accordingly, the parties in this case stipulated that all discovery in *Busher* may be used in this action. (Docket No. 37).   Some of the parties' arguments here are predicated on, or informed by, Judge Román's rulings in *Busher* and, therefore, the Court briefly summarizes them below.

**1.  The Court's Dismissal of Claims Not Related to the 2013 Lease Extension**

In *Busher*, the defendants sought summary judgment, arguing that (1) the plaintiffs' claims were time-barred; (2) the plaintiffs had acquiesced to, or ratified, the alleged conduct and

thus were estopped from asserting their claims; and (3) no issue of material fact existed as to the

defendants' breach of its fiduciary duties to WFHC shareholders in extending the lease

agreements. *Busher*, 2019 WL 13217248, at *4-*8.  Judge Román granted partial summary

judgment on statute of limitations grounds, finding that the plaintiffs were on inquiry notice of

claims beginning in 1983, if not sooner, and thus claims arising from conduct before June 16,

2008 were time-barred. *Id.* at *6.  Therefore, the plaintiffs' only surviving claims were those

arising from the 2013 lease extension. *Id.*  Judge Román held that issues of material fact existed

as to the plaintiffs' remaining claims. *Id.* at *6-*8.

## 2.  The Court's Pre-Trial Motions Decisions

In anticipation of trial, the *Busher* parties filed several pre-trial motions.  As relevant

here, the defendants moved for dismissal of the plaintiffs' corporate dissolution claim for lack of

subject matter jurisdiction. *Busher v. Barry*, 14-cv-4322 (NSR), 2019 WL 6895281, at *19-*21

(S.D.N.Y. Dec. 18, 2019).  Judge Román declined to reach the merits of the defendants'

jurisdictional challenge, reasoning that:

> even assuming that the Court does possess jurisdiction to dissolve WFHC, the
> Court finds it proper to abstain from exercising that power. WFHC, a corporation
> formed under the laws of the state of New York, is a creature of the state, and its
> dissolution necessarily implicates New York's comprehensive system of corporate
> governance.

*Id.* at *20.  Accordingly, Judge Román granted the defendants' portion of its motion *in limine*

seeking dismissal of the corporate dissolution claim on abstention grounds. *Id.* at *21.

The defendants further moved to preclude the plaintiffs from introducing evidence that

bore on whether the WFHC shares at issue constituted securities with investment value under the

Securities Exchange Act of 1934 and Supreme Court precedent. *Id.* at *13.  The court granted the

motion, holding that any "factual evidence as to the classification of WFHC shares for purposes

-6-

of the federal securities laws, such evidence is irrelevant to the question of WFHC's corporate purpose under state law." *Id*.  In so holding, the court noted that such evidence would only serve to confuse the jury by distracting them from "the core legal questions for trial," and noted that the Securities Exchange Act of 1934 was "not even in existence at the time WFHC's original shareholders purchased their shares, and for that reason alone could not possibly have informed their expectations" as to WFHC's purpose. *Id*.

### 3.  The Plaintiffs' Voluntary Dismissal of the Remaining Claims and Stay Request

By order dated October 14, 2020, Judge Román so-ordered the *Busher* plaintiffs' voluntary dismissal of the remaining claims with prejudice. (*Busher v. Barry*, 14-cv-4322, Docket No. 358 (Final Order for Voluntary Dismissal of Claims Under Rule 41(a)(2)) (Oct. 14, 2020)).  The parties jointly requested that the instant matter be held in abeyance pending the Second Circuit's resolution of, *inter alia*, the plaintiffs' appeal of the court's decisions described above. (*See* Docket No. 117; *see also Busher v. Barry*, 14-cv-4322, Docket No. 361 (Notice of Appeal) (Oct. 14, 2020)).  The Court granted the parties' request, and directed them to write to the Court within 72 hours of the Second Circuit's decision. (Docket No. 117).  The Second Circuit affirmed the court's summary judgment decision on November 2, 2021. *Busher v. Barry*, No. 20-3587-cv, 2021 WL 5071871, at *4 (2d. Cir. Nov. 2, 2021).  However, the parties did not notify the Court of the Second Circuit's decision until August 9, 2022. (*See* Docket No. 118).

## II.  DISCUSSION

"A decision to grant or deny a motion to amend is within the sound discretion of the trial court." *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998).  Rule 15 of the Federal Rules of Civil Procedure governs "motions to amend the pleadings once the time for

amending a pleading as of right has expired." *Moroughan v. Cty. of Suffolk*, 99 F. Supp. 3d 317, 322 (E.D.N.Y. 2015). Pursuant to Rule 15(a), leave to amend shall be "freely give[n]" "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Under this liberal standard, a motion to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016).

## A. Undue Delay

Defendants argue that Plaintiffs' explanation for waiting years to add new claims and four new individuals is insufficient. (Def. Opp'n at 12). Specifically, Defendants argue that: (i) Plaintiffs were apprised of the dispute as to whether the shares qualified as securities when Defendants raised that issue in the *Busher* action four-and-a-half years ago; and (ii) the newly added Defendants were added in the *Busher* action eight years ago. (*Id.*). Plaintiffs reply that Plaintiffs expected that the issue of whether the shares qualify as securities would be resolved in the *Busher* action, but it ultimately was not, and that Defendants' timeline fails to account for the time that this action was held in abeyance pending resolution of the *Busher* appeal. (Pl. Reply at 3-4).

"Delay alone, in the absence of bad faith or prejudice, is not a sufficient reason for denying a motion to amend." *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 97 (S.D.N.Y. 2010); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000) ("[W]e have held repeatedly that 'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion ....") (internal citations omitted). Furthermore, "delay is rarely fatal to a Rule 15 motion if it can be explained." *Duling*, 265 F.R.D. at 97. "Although *some* explanation must be provided to excuse a delay ... even vague or 'thin' reasons are sufficient, in the absence of prejudice or bad

faith." *Id.* at 97-98. (internal citations omitted).  Moreover, "under the liberal standard of Rule

15(a), leave to amend may be appropriate at any stage of litigation." *Id.* at 97; *see also*

*Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (collecting

cases where leave to amend was granted after delays ranging from two to five years); *Blagman v.*

*Apple, Inc.*, No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014)

(collecting cases where leave to amend was granted after delays of up to seven years).

Here, Defendants argue that Plaintiffs "offer no real explanation for their delay" in filing

the motion to amend. (Def. Opp'n at 12).  However, Plaintiffs have explained that this action was

largely held in abeyance while issues, including the shares' status, were litigated, and then

awaiting decision on appeal, in *Busher*. (*See* Pl. Mtn. at 1-2; Pl. Reply at 3-4).  The Second

Circuit rendered its decision in *Busher* in November 2021, and did not rule on the issue of

whether the shares constitute securities. *See Busher,* 2021 WL 5071871.  Additionally, the

parties failed to jointly notify this Court of the Second Circuit's *Busher* decision until August 9,

2022, (*see* Docket No. 118), and Plaintiffs then filed the instant motion to amend on September

20, 2022, (Docket No. 127).  Thus, Plaintiffs have offered a reason for their delay, and filed the

instant motion within one month of the stay being lifted here.  Moreover, even accepting,

*arguendo*, Defendants' argument that Plaintiffs have unnecessarily waited over four years to

move to amend, courts have granted motions to amend after similar periods of delay. *See In re*

*Actos End-Payor Antitrust Litig.*, No. 13-CV-9244 (RA), 2018 WL 840099, at *7 (S.D.N.Y. Feb.

12, 2018) (granting motion to amend complaint even where "case ha[d] been pending for just

over four years"); *Blagman*, 2014 WL 2106489, at *3 (granting motion to amend where "twenty

months…ha[d] elapsed since the plaintiff first filed" their complaint and collecting cases where

"courts in this Circuit have routinely granted leave to amend where the delay was much longer").

Defendants also argue that Plaintiffs' motion should be denied because Plaintiffs were made aware of the facts underlying the proposed amendments when they arose in *Busher*. (*See* Def. Opp'n at 12-13). However, courts have routinely held that "[s]imply alleging that the plaintiff could have moved to amend earlier than [it] did ... is insufficient to demonstrate undue delay." *Agerbrink*, 155 F. Supp. 3d at 452; *see also Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 460 (S.D.N.Y. 2012) ("[T]he motion to amend will not be denied by reason of plaintiffs' delay in alleging facts that were previously within their knowledge"). Moreover, Defendants do not claim that Plaintiffs engaged in bad faith or dilatory tactics. Thus, Defendants' claim of undue delay, based solely on prior knowledge of the underlying facts, is insufficient to establish undue delay. Accordingly, Defendants must show "undue prejudice in connection with the delay in order to warrant denial of the motion" to amend. *Cmty. Ass'n Underwriters of Am., Inc. v. Main Line Fire Prot. Corp.*, 18 Civ. 4273 (PMH) (JCM), 2020 WL 5089444, at *3 (S.D.N.Y. Aug. 28, 2020).

## B. Undue Prejudice

While "[p]rejudice to the opposing party" is "the most important reason for denying a motion to amend," "only *undue* prejudice justifies denial." *Blagman*, 2014 WL 2106489, at *3 (quoting *Frenkel v. New York City Off-Track Betting Corp.*, 611 F. Supp. 2d 391, 394 (S.D.N.Y. 2009)). To determine whether a proposed amendment will cause undue prejudice, courts "generally consider whether the assertion of the new claim or defense would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Block v. First Blood Assoc.*, 988 F.2d 344, 350 (2d Cir. 1993)). Central to

this analysis is the extent to which the new claims arise from the existing ones and whether a party had prior notice of a new claim. *See Blagman,* 2014 WL 2106489, at *3. "The non-moving party bears the burden 'of demonstrating that substantial prejudice would result were the proposed amendment to be granted.'" *Agerbrink,* 155 F. Supp. 3d at 454 (quoting *Oneida Indian Nation of N.Y. v. Cty. of Oneida*, 199 F.R.D. 61, 77 (N.D.N.Y. 2000) (noting that where moving party provides explanation for delay, opposing party must make "greater showing" of prejudice)).

Defendants argue that allowing an amendment would "severely prejudice" them because "Defendants have a right to resolution based on the theories the parties have litigated for six years, without the additional delay and litigation caused by this belated amendment." (Def. Opp'n at 13). However, Defendants do not specify how the amendment would delay the action, given that the Court ordered the parties to proceed with discovery in tandem with the filing of this motion. (*See* Docket No. 121 (Aug. 19, 2022 Memo Endorsement)).[3] Moreover, it is undisputed that the additional claims are based on the same facts underlying the pre-existing claims, and thus no additional discovery is required. (Pl. Mtn. at 6; Def. Opp'n at 12; Pl. Reply at 4-5 (arguing that "Defendants do not dispute that the new claims *will not require any additional discovery*")) (emphasis added). Thus, Defendants will not face "unique difficulty" in defending

---

[3] Defendants argue that they would face undue prejudice if the Court grants leave to amend here because they have litigated related claims brought by Plaintiffs' counsel "in multiple cases and fora" for years. *See* Def. Opp'n at 13. However, Defendants provide no persuasive support for this proposition. Defendants rely on *Anderson v. Greene,* but *Anderson* involved a (previously *pro se*) plaintiff who attempted, through newly-retained counsel, to file a *fourth* amended complaint that, in the Court's view, "evoke[d] the movie 'Groundhog Day'" by reviving previously abandoned or dismissed allegations, asserting new allegations without factual support, and ignoring the court's prior rulings. *Anderson v. Greene,* 14 Civ. 10249 (KPF), 2017 WL 3503686, at *1 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 774 F. App'x 694 (2d Cir. 2019). In finding undue prejudice, the court found that "Plaintiff's suit ha[d] become something of an ouroboros—an infinite loop of complaints and motions directed at [the defendants]," and noted that "the principal reason that discovery ha[d] been stalled [was] that Plaintiff ha[d] deliberately adopted a 'moving target' approach to his pleadings, necessitating additional motion practice." *Id.* at *14. While the Court appreciates Defendants' frustrations in having to litigate claims regarding the WFHC and WFGC in multiple fora, *Anderson* is plainly distinguishable.

against the RICO claims. *Duling*, 265 F.R.D. at 102 ("The fact that a proposed amendment would add new issues is normally not prejudicial unless the opposing party would be confronted with some unique difficulty in defending against the new issues."); *see also Blagman*, 2015 WL 2106489, at *3-*4. Accordingly, the Court does not find that Defendants would be unduly prejudiced by the proposed amendment.

## C. Futility

A motion to amend may be denied if "the proposed amendment is futile." *Agerbrink*, 155 F. Supp. 3d 452. "An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *DeMartino v. New York*, 586 F. App'x 68, 69 (2d Cir. 2014) (summary order). "Therefore, '[f]or the purposes of evaluating futility, the 12(b)(6) standard is applied: all well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader.'" *Bonsey v. Kates*, No. 13 Civ. 2708 (RWS), 2013 WL 4494678, at *8 (S.D.N.Y. Aug. 21, 2013) (quoting *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 282 (S.D.N.Y.2006)). The party "opposing a motion to amend ... bears the burden of establishing that an amendment would be futile." *Bonsey*, 2013 WL 4494678, at *8.

Defendants argue that Plaintiffs' proposed amendment would be futile because the proposed amendment would not survive a motion to dismiss. (Def. Opp'n at 13). Specifically, Defendants contend that the proposed RICO claim is statutorily barred because it is premised on conduct that Plaintiffs also allege constitutes securities fraud, and that the RICO claims are time-barred. (*Id.* at 13-15). Plaintiffs counter that it is permissible to plead RICO claims in the alternative to securities fraud and that the RICO claims are timely under the "separate accrual" rule. (Pl. Reply at 6-14).

**1. Plaintiffs' RICO Claims Are Barred By Statute**

Defendants argue that Plaintiffs' PSAC is futile because "premising RICO claims on actions that are also alleged to be the basis for securities fraud claims is unambiguously barred by" the RICO statute and Second Circuit precedent. (Def. Opp'n at 14-15). Plaintiffs do not dispute that generally pleading RICO claims with securities fraud is impermissible, but argue that it is permissible to plead an alternative RICO claim where it is disputed that the shares in question are securities. (Pl. Reply at 6-9).

**i. The PSLRA Bar**

RICO imposes criminal and civil liability where an entity engages in "a pattern of racketeering activity." *See* 18 U.S.C. § 1962(a)-(d). "Racketeering activity" is defined to include "any act which is indictable" under specified provisions of Title 18, including mail fraud and wire fraud. *See id.* § 1961(1)(B). The statute defines a "pattern of racketeering activity" to be at least two acts of racketeering activity over the course of ten years. *Id.* § 1961(5). Before 1995, plaintiffs "'could allege a private civil RICO claim for securities laws violations sounding in fraud[,] because 'fraud in the sale of securities' was listed as a predicate offense.'" *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 716 (S.D.N.Y. 2021) (quoting *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011)). This resulted in plaintiffs "regularly elevat[ing] fraud to RICO violations" in order to avail themselves of "the potential bonanza of recovering treble damages." *Id.* (citation and quotations omitted). Accordingly, in 1995, Congress enacted Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), which "amended and limited the scope of the RICO statute." *Great W. Ins. Co.*

*v. Graham*, 18-CV-6249 (VSB), 2020 WL 3415026, at *37 (S.D.N.Y. June 22, 2020).  Section

107 provides that:

> Any person injured in his business or property by reason of a violation of [18 U.S.C.
> § 1962] may sue therefor in any appropriate United States district court and shall
> recover threefold the damages he sustains and the cost of the suit, including a
> reasonable attorney's fee, *except that no person may rely upon any conduct that
> would have been actionable as fraud in the purchase or sale of securities to
> establish a violation of section 1962.*

18 U.S.C. § 1964(c) ("PSLRA bar") (emphasis added).  Courts in this Circuit have interpreted

this amendment to mean that "if a complaint alleges that a RICO enterprise is engaged in a single

scheme of racketeering activity, then when any predicate act is barred by the PSLRA it is fatal to

the entire RICO claim." *Zanghi v. Ritella*, 19 Civ. 5830 (NRB), 2021 WL 4392756, at *16

(S.D.N.Y. Sept. 24, 2021), *appeal dismissed sub nom. Zanghi v. Callegari*, No. 22-266, 2023

WL 1097560 (2d Cir. Jan. 30, 2023) (citation omitted).  Put simply, "the [PSLRA bar] 'bar[s]'

civil RICO claims based on allegations of securities fraud.'" *Bongiorno v. Baquet*, 20-CV-7288

(LJL), 2021 WL 4311169, at *13 (S.D.N.Y. Sept. 20, 2021) (quoting *MLSMK*, 651 F.3d at 274);

*see also Monterey Bay Mil. Hous., LLC,* 531 F. Supp. 3d at 719 ("a plaintiff cannot avoid the

[PSLRA bar] by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil

RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud")

(quoting *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999)).

The purpose of this bar is to "prevent litigants from using artful pleading to boot-strap securities

fraud cases into RICO cases, with their threat of treble damages." *MLSMK,* 651 F.3d at 274

(citation and quotation omitted).

### ii. Plaintiffs State a Securities Fraud Claim

"The elements of a private securities fraud claim based on violations of § 10(b) and Rule

10b–5 are: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *In*

*re Beacon Assocs. Litig.*, 282 F.R.D. 315, 332 (S.D.N.Y. 2012) (quoting *Erica P. John Fund,*

*Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011)).  In the PSAC, Plaintiffs allege that: (1)

"[s]hares of [WFHC] are securities within the meaning of the federal securities laws"; (2)

Defendants knowingly "falsely represented to Plaintiffs the value of their [WFHC] shares and

further falsely represented that the [WFGC] was the only permissible buyer"; (3) "Defendants

employed devices, schemes and artifices and omissions to defraud; made untrue statements of

material fact and/or omitted to state material facts necessary to make the statements not

misleading; and engaged in acts, practices and a course of business which operated as a fraud

and deceit upon Plaintiffs"; and (4) "Plaintiffs have suffered damages…in reasonable reliance"

on the alleged misrepresentations. (PSAC ¶¶ 317-22).  Defendants do not argue that Plaintiffs

fail to plead securities fraud, and, therefore, accepting the well-pleaded allegations as true, and

drawing all inferences in Plaintiffs' favor, the Court finds that Plaintiffs have stated a *prima facie*

securities fraud claim.[4]

### iii. Plaintiffs' RICO Claim Is Barred By the PSLRA Bar

It is undisputed that Plaintiffs rely on the same conduct underlying their securities fraud

claim as support for their RICO claim. (*See* Pl. Mtn. at 3) ("Plaintiffs rely on predicate acts of

racketeering stated by the existing factual allegations").  Indeed, Plaintiffs repeatedly emphasize,

in support of their arguments that there will be no undue prejudice or delay if the motion to

amend is granted, that the newly-added claims are derived from the "same factual transactions,"

---

[4] In connection with this motion, Defendants have not claimed that Plaintiffs' securities fraud claim would be futile, or that the WFHC shares do not constitute securities within the meaning of federal securities laws.  Accordingly, the Court does not opine on that issue.

and that the PSAC merely "supplement[s] [the existing allegations] in some instances with further particulars mainly concerning Defendants' use of mail and wire communications for the purpose of showing the elements of [RICO]." (Pl. Mtn. at 3, 5). In other words, Plaintiffs seek to plead a RICO claim by "recasting" alleged actionable securities fraud conduct as mail and wire fraud. Such a "recasting" is plainly not allowed by the PSLRA bar. *See Fezzani v. Bear, Stearns & Co.*, No. 99-CIV-0793 (RCC), 2005 WL 500377, at *3 (S.D.N.Y. Mar. 2, 2005) ("The amendment also bars recasting conduct that would be actionable securities fraud as mail or wire fraud."); *Picard v. Kohn*, 907 F. Supp. 2d 392, 398 (S.D.N.Y. 2012) ("The Second Circuit has recently held that this [PSLRA bar] language bars civil RICO claims, including claims for wire and mail fraud, 'alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant.'") (quoting *MLSMK*, 651 F.3d at 277); *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1319 (S.D.N.Y. 1997) ("The [PSRLA bar's] legislative history is unequivocal in stating that where allegations of mail and wire fraud derive from conduct otherwise actionable as securities fraud, no RICO claim will lie"); *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 650 (S.D.N.Y. 2017) ("Today, however, a single securities transaction that coincides with the fraudulent scheme can be the death knell of a RICO claim.").

Nevertheless, Plaintiffs argue that the PSAC is a permissible alternative pleading because "Defendants…have denied that the [WFHC] shares constitute securities within the meaning of federal securities laws." (PSAC ¶¶ 315-16). As an initial matter, while Federal Rule of Civil Procedure 8(d) does generally permit alternative pleading, the Federal Rules do not "abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072(b). Additionally, courts have rejected similar attempts to circumvent the PSLRA bar and dismissed RICO claims brought in

the alternative should the court ultimately not determine that the at-issue "equity interests" are

actionable "securities." *See Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw*

*LLP*, 612 F. Supp. 2d 267, 280 (S.D.N.Y. 2009); *see also Fezzani*, 2005 WL 500377, at *3-*4

(denying plaintiffs' motion to amend to "add [] RICO claims in the alternative" should the court

ultimately determine that the alleged securities fraud was not actionable because plaintiffs could

then potentially "reap the benefits of a RICO claim complete with the threat of treble damages by

merely failing to state a cause of action for securities fraud"); *Stephenson v. Deutsche Bank AG*,

282 F. Supp. 2d 1032, 1072 (D. Minn. 2003) (holding that the PSLRA bar prevents "plaintiffs

from pleading RICO counts in the alternative" even where "[d]iscovery, of course, may not bear

out Plaintiffs' [securities fraud] allegations" which is a risk that is "no different than the risk

faced by every plaintiff in every proceeding").  There is no argument presently before this Court

that the WFHC shares at issue are not securities within the meaning of the federal securities

laws.  Therefore, the PSAC pleads a RICO claim based on the conduct that Plaintiffs also allege

to be securities fraud.  Such pleading is not permissible under the PSLRA bar.

In support of their argument that alternative pleading is permissible in this context,

Plaintiffs exclusively rely on a footnote from a summary judgment decision in the Eastern

District of New York, *Marini v. Adamo*, 812 F. Supp. 2d 243, 261 n.15 (E.D.N.Y. 2011).  There,

the defendants argued that the plaintiffs' securities fraud claims failed as a matter of law because

the at-issue coin transactions did not constitute an "investment contract" under federal securities

law. *Id*. at 257-61.  The Court found that issues of fact existed as to whether the at-issue

transactions were investment contracts and denied summary judgment on that ground. *Id*. at 261.

The court then dropped a footnote stating that it was unable to render a decision on the

defendants' alternative argument that, if the plaintiffs' securities fraud claim was allowed to

proceed, then the RICO claim was barred by the PSLRA. *Id*. at 261 n.15. The court reasoned

that it could not determine whether the at-issue transactions were "actionable…prior to a jury's

determination" as to whether they were "investment contracts." *Id*. While the Second Circuit

ultimately affirmed the district court's determinations as to liability, it did not analyze the district

court's determination regarding the PSLRA bar because the plaintiffs' RICO claims were

discontinued by stipulation prior to trial. *Marini v. Adamo*, 644 F. App'x 33, 35 (2d Cir. 2016)

(summary order).

Respectfully, the Court declines to adopt the *Marini* court's conclusion for several

reasons. First, the *Marini* court did not meaningfully engage with the language or history of the

statute in the brief footnote. This Court is, therefore, unable to determine the rationale for the

court's decision, particularly where the Second Circuit has instructed that the PSLRA bar is to be

interpreted "broadly," and stated that there is no indication "that Congress intended that it be

applied in [a] limited manner." *MLSMK*, 651 F.3d at 278. Second, taken to its logical

conclusion, the *Marini* court's "wait and see" approach runs contrary to the legislative intent of

the PSLRA bar, which was to "prevent litigants from using artful pleading to boot-strap

securities fraud cases into RICO cases, with their threat of treble damages." *Id*. at 274 (citation

and quotations omitted). Mindful of this legislative intent, courts have rejected attempts to

alternatively plead by "latch[ing] on to the word 'actionable' to argue" there is no danger of

concomitant securities fraud and RICO claims "within a single lawsuit" if plaintiffs cannot

ultimately establish securities fraud liability, because their securities claim would then "cease to

be 'actionable.'" *Thomas H. Lee Equity Fund V*, 612 F. Supp. 2d at 281-83; *see also Fezzani*,

2005 WL 500377, at *4 ("Were courts to permit RICO claims whenever a plaintiff failed to state

a cause of action for securities fraud against a particular defendant, plaintiffs would then have the

incentive to present only those facts that, if taken as true (as they must be on a motion to dismiss), would not form the basis of a securities-fraud claim."). Third, in its summary order, which lacks precedential effect, the Second Circuit did not pass on the *Marini* district court's interpretation of the PSLRA bar. Thus, the Court is not able to glean any interpretative guidance from the Second Circuit's decision. Accordingly, the Court finds that Plaintiffs' cited footnote in *Marini* has limited persuasive value, and declines to adopt the conclusion set forth therein.

In sum, the Court finds that Plaintiffs' RICO claims would be futile since they are statutorily prohibited under the PSLRA bar. Therefore, Plaintiffs' motion to amend is denied.

## 2. Plaintiffs' RICO Claims Are Time-Barred

Moreover, even if the PSLRA bar did not apply, Plaintiffs' RICO claims are futile because they are time-barred. "The statute of limitations for a civil RICO claim is four years." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013); *see also Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 156, (1987). The Second Circuit applies a "discovery accrual rule, under which the limitations period begins to run 'when the plaintiff discovers or should have discovered the RICO injury.'" *Cohen*, 711 F.3d at 361 (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir.1998)). Accordingly, the statute of limitations begins to run when "'[the plaintiff] has actual or inquiry notice of the injury.'" *Id.* (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d at 60); *see also Monterey Bay Mil. Hous., LLC*, 531 F. Supp. 3d at 710. For inquiry notice, the duty to inquire "is triggered by information that 'relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'" *Cohen*, 711 F.3d at 361 (quoting *Newman v. Warnaco Grp.*, 335 F.3d 187, 193 (2d Cir.2003)). The information "'need not detail every aspect of the [subsequently] alleged fraudulent scheme.'" *Id.* (quoting *Staehr v. Hartford Fin.*

*Servs. Grp.*, 547 F.3d 406, 427 (2d Cir.2008)).  Moreover, "'[t]he duty of inquiry results in the

imputation of knowledge ... in two different ways, depending on whether the [plaintiff]

undertakes some inquiry.'" *Monterey Bay Mil. Hous., LLC*, 531 F. Supp. 3d at 710 (quoting *LC*

*Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)).  If the

plaintiff makes an inquiry, the court "will impute knowledge of what [a plaintiff] in the exercise

of reasonable diligence[ ] should have discovered concerning the fraud, and in such cases the

limitations period begins to run from the date such inquiry should have revealed the fraud."

*Cohen*, 711 F.3d at 362 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d

Cir.2005)).  Where no inquiry is made, "knowledge will be imputed as of the date the duty

arose." *Monterey Bay Mil. Hous., LLC*, 531 F. Supp. 3d at 711 (quoting *Cohen*, 711 F.3d at 361-

62); *see also Takeuchi v. Sakhai*, No. 05 Civ. 6925 (JSR), 2006 WL 119749, at *2 (S.D.N.Y. Jan.

17, 2006) ("In the case of a RICO claim predicated on fraud, a plaintiff should have discovered

his injury when he has received information sufficient to alert a reasonable person to the

probability that he has been misled.").  New York employs a similar rule for fraud and fraudulent

breach of fiduciary duty. *Cohen*, 711 F.3d at 361.  The Second Circuit applies a "separate accrual

rule" to RICO violations "which begins the RICO limitations period afresh with each new

injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d at 59.  However, for this rule to apply,

"the injury ha[s] to be new and independent." *Id.*

Plaintiffs assert that the allegedly fraudulent sale of the shares constitutes a "new and

independent injury" that triggers the separate accrual rule for their RICO claims. (Pl. Reply at 9-

10).  First, Plaintiff Clune sold his share in January 2012, (*see* Pl. Reply at 11), and his RICO

claim would, therefore, be untimely even if the separate accrual rule applied.  However, Courts

have declined to apply the separate accrual rule where the alleged acts were "simply a part of the

alleged scheme" and "were continuing efforts to conceal the initial fraud, and not separate and distinct fraudulent acts resulting in new and independent injuries." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d at 56-61; *see also Town of Mamakating, New York v. Lamm*, 651 F. App'x 51, 54 (2d Cir. 2016) (summary order) (holding separate accrual rule inapplicable where plaintiffs alleged defendants undertook fraudulent scheme to gain control of local resources and resource management and argued subsequent uses of the fraudulently obtained zoning authority were "new and independent" injuries). By contrast, courts have found the separate accrual rule applicable where the plaintiffs alleged a "'variety of schemes' each of which involved the 'misappropriation of discrete amounts of money' from multiple sources," *Bascuñan v. Elsaca*, No. 15 Civ. 2009 (GBD), 2021 WL 3540315, at *6 (S.D.N.Y. Aug. 11, 2021), or a "series of fraudulent actions undertaken to divert and conceal assets and income… involving frequent misappropriations of discrete amounts of money from different sources," *Bingham v. Zolt*, 66 F.3d 553, 561 (2d Cir. 1995). Here, Plaintiffs allege a "longstanding scheme" and "longstanding pattern of racketeering activity," with the predicate acts including the perpetual extension of the "sweetheart lease," and acts to restrict share transfers and artificially deflate share prices, ultimately resulting in Defendants obtaining Plaintiffs' shares via misleading statements and omissions. (*See* PSAC ¶¶ 265, 308-16). Plaintiffs' RICO allegations thus present the sale of shares as "simply a part of the [single] alleged scheme," rendering the separate accrual rule inapplicable. *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d at 56-60.

Moreover, even assuming, *arguendo*, that the RICO claims "relate back" to the prior fraud allegations, (*see* Pl. Reply at 10), they would be time-barred. Plaintiffs presented similar

tolling arguments in connection with their motion for class certification in this matter. *See Clune*,

2019 WL 3369455, at *3.  There, Judge Román stated:

> Plaintiffs …argue that the statute of limitations should be tolled because Defendants fraudulently concealed facts that might have put potential Class members on inquiry notice of the alleged fraud. (Pls.' Mot. p. 33.) However, the Court rejected this precise argument in a related case, *Busher v. Barry*, a shareholders derivative suit with facts and allegations similar to those in the current action. (No. 14-CV-4322 (NSR), docket 227 (S.D.N.Y. Mar. 12, 2019) ('*Busher* Opinion').) The plaintiffs in both *Busher* and this case claim that the defendants—primarily leaders in the Club and WFHC—intentionally misled them over several decades by failing to disclose to the respective plaintiffs —shareholders and sellers of WFHC stock— material facts about WFHC, its shares, and its connection to the Club. (*Busher* Compl., 14-CV-4322, docket 1, ¶¶ 8, 9, 58); (Am. Compl. ¶¶ 1, 7–8.) In *Busher*, the Court held that neither equitable estoppel nor the fraud discovery rule tolled the statute of limitations because with reasonable diligence, the *Busher* plaintiffs could have discovered the allegedly illegal activity earlier. (*Busher* Opinion pp. 9–13). The *Busher* plaintiffs were on inquiry notice, and the same is true here…. Plaintiffs here were or should have been aware of the possibility of misrepresentation and fraud for the same reasons discussed in *Busher* and the reasons below. Plaintiffs allege that, 'starting relatively early in the Club's history,' Defendants failed to properly provide notice to WFHC shareholders, particularly those who did not belong to the Club, of annual shareholder meetings. (Am. Compl. ¶ 250.) This failure is sufficient to put Plaintiffs on inquiry notice…. Moreover, Plaintiffs should have been aware of the possibility of deception or illegal activity based on the obvious discrepancy between the value of land and the $30,000 annual rent in the renewed lease, of which shareholders were notified.

*Id.* at *3-*4.  Plaintiff Fisher inherited his share from his father, who had been a senior club

member, and the share was transferred into Plaintiff Fisher's name in 1974. (PSAC ¶ 16).

Plaintiff Clune is the legal representative of Barbara Clune, who owned one share of the WFHC

at the time of her death, and had received her share as a "gift from her mother," who was married

to a "long-time member of the" WFGC. (PSAC ¶ 15).  Under "the same reasons discussed in

*Busher*," *see Clune*, 2019 WL 3369455, at *4, Plaintiffs would be on inquiry notice of the RICO

claims no later than 1983, when "[w]ith reasonable diligence," they "certainly could have

discovered that Defendants were buying up shares of WFHC and that WFHC was not being used

to produce profit for investors…if not sooner," *Busher*, 2019 WL 13217248, at *6.

Accordingly, the Court finds that Plaintiffs' RICO claims would be time-barred, and thus futile.  Because the Court has determined that Plaintiffs' RICO claims are futile and denies the motion to amend on that ground, it does not reach the remaining arguments regarding failure to cure deficiencies. (*See* Def. Opp'n at 17-22).

## III. CONCLUSION

For the reasons stated herein, Plaintiffs' motion to amend is denied.  The Clerk of the Court is respectfully requested to terminate the pending motion (Docket No. 127).

Dated:   April 13, 2023
         White Plains, New York

                              **SO ORDERED:**

                              JUDITH C. McCARTHY
                              United States Magistrate Judge